NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190749-U

NO. 4-19-0749

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| PEGGY S. MECHLING, | ) | Circuit Court of |
|     Plaintiff-Appellee, | ) | Macon County |
|     and | ) | No. 16D433 |
| RONALD A. MECHLING, | ) | |
|     Defendant-Appellant. | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant did not establish the trial court abused its discretion in awarding $2400 in monthly temporary maintenance to plaintiff.

(2) Defendant did not show the trial court abused its discretion in attributing the line of credit on the marital home to him while giving the marital home to plaintiff.

(3) Defendant did not establish the trial court abused its discretion in distributing more equity to plaintiff, as defendant did not establish the temporary maintenance order was erroneous and defendant owed plaintiff over $70,000 in maintenance payments.

¶ 2    In January 2017, the trial court ordered defendant, Ronald A. Mechling, to pay plaintiff, Peggy S. Mechling, $2400 per month in temporary maintenance. Ronald made only two months of maintenance payments. In September 2019, the court entered an order distributing the marital property and debts between the parties. Ronald appeals the distribution, arguing the court

abused its discretion by (1) awarding temporary maintenance as, when considering the expenses necessary to run his business, the parties' income was essentially the same; (2) distributing debt on the marital home to him while giving the marital home to plaintiff; and (3) assigning greater equity to plaintiff. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4          Peggy and Ronald were married in August 1983. Two children were born to the marriage. Both children are emancipated; the younger was a student at the University of Illinois. During the marriage, Peggy worked for the University of Illinois Extension Office. Ronald earned income by owning and renting property. Ronald also earned income by refereeing.

¶ 5          In October 2016, Peggy petitioned for the dissolution of their marriage. She also sought temporary maintenance.

¶ 6                          A. Hearings on Temporary Maintenance

¶ 7          On November 28, 2016, before the hearing, Ronald filed his financial affidavit. Until November 2016, Ronald's 2016 gross income was $5165. In 2015, he earned $7519. Of his monthly income, $475 was earned from the rental properties; $95 was in referee income. His monthly living expenses were $8969. The fair market value of the marital home was $170,000. The "balance due" on the property was $65,000. Ronald provided the total fair market value of the 28 properties owned, including the marital home, as "$887,300." We have added the numbers, and the actual total is $888,300. Although Ronald listed the balance due on the properties, he did not total the balance due for all properties for the court. We added those numbers and found the amount owed on all property was $370,877. When the marital residence is removed from these calculations, the fair market value for the remaining 27 properties as of November 2016 was $718,300. When the balances due are subtracted, these figures show an

equity value for the rental properties as $411,423. Ronald's other assets included $37,605 in checking, savings, and money-market accounts, $12,500 worth of vehicles, and $24,000 in a retirement account.

¶ 8        Peggy filed a section 501(a)(1) (750 ILCS 5/501(a)(1) (West 2016)) affidavit. Peggy was employed as an office support specialist at the University of Illinois Extension Office. Her gross earnings in 2015 were $32,656.93. To help with living expenses, Peggy began a part-time job with a church, earning $10 an hour, working approximately 13.6 hours per week. Peggy asserted defendant managed or rented 29 parcels of real estate and they reported Ronald's gross income on Schedule E 2015 federal income-tax return as $150,700. Peggy averred, since the filing of the 2015 return, Ronald acquired another parcel of real estate for $12,000 and a truck with a snowblade. Since the separation, Ronald also purchased his father's pickup truck. Plaintiff asserted her living expenses exceeded her income by $5540.22 each month.

¶ 9        Peggy reported her gross monthly income as $2959, with her total monthly deductions at $971. Peggy listed her monthly household expenses at $4210. Of that amount, Ronald paid $3550 and Peggy paid $660. The total monthly living expenses were $7173. Ronald paid $4168 of that amount. Peggy also had monthly debt payments of $355. Peggy listed her assets as $7091 in checking, savings, and money-market accounts and $57,225 in retirement benefits. Peggy had a 2008 Ford Escape valued at $4500. Peggy listed the fair market value of the properties managed by Ronald as $718,300; she did not know the balance due for the bulk of those properties. The fair market value of the family home was $170,472; the balance due on the home was $53,420.61.

¶ 10        On January 9, 2017, the trial court held a hearing on the petition for temporary relief. Peggy requested $3223.25 in monthly temporary maintenance. Ronald disputed the

amount, arguing Peggy's figure was too high as it incorrectly included a health expense and college expenses for their sons, which Ronald maintained should have been subject of proceedings under section 513 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/513 (West 2016)). The court stated the following before setting temporary maintenance at $2400 per month: "I mean this is what it costs her to live. This is money she expends. Okay. I am going to show that it is heard. I have reviewed the documents. I am going to fix temporary maintenance in the amount of $2,400 per month."

¶ 11       Ronald filed a motion to reconsider the temporary maintenance award. Ronald argued the $150,000 income for the rental properties was gross income that did not account for expenses necessary to his business. Ronald asserted when his expenses were considered, excluding depreciation, he earned $33,510 in annual income from his real property. Ronald argued, because Peggy's gross income was more than his, temporary maintenance should not have been ordered.

¶ 12       Peggy argued Ronald had "sole and exclusive possession" of "well over a million dollars in real estate value for which [Peggy's counsel doesn't] believe is any mortgage on it." Peggy stated the temporary maintenance took into consideration the expenses Peggy made for the parties' son who was a college student. Peggy asserted the financial affidavit does not spell out the reasonable or necessary business expenses.

¶ 13       The court denied the motion, stating the following:

"I am going to show the evidence and the arguments heard. I remember this case. I looked at the affidavits. He controls a huge amount of property, but according to the information I was supplied, derives minimal income from it; approximately, less than

- 4 -

three percent return on it. So I don't think that's really, you know, when you look at the expenses, everything is an expense and he has no income. I think the fact of the matter, he does have a substantial cash flow, and he has control over a lot of properties."

¶ 14                              B. Hearing on Property Distribution

¶ 15        In June 2019, the trial court began the hearing on the property issues. At the same hearing, the court considered two contempt petitions filed by Peggy. In her contempt petitions, Peggy asserted Ronald failed to pay maintenance and failed to deposit money from an insurance check into the designated account.

¶ 16        At the hearing, Peggy testified on her own behalf. The parties' younger son was beginning his senior year at the University of Illinois. Because of Peggy's employment, they had the benefit of only having to pay half of their son's tuition. Peggy had to take out a $3000 loan to pay for the son's 2018 tuition. It was agreed Peggy, Ronald, and the son would each cover one third of the expenses. Peggy testified Ronald owed approximately $12,400. Peggy paid $249 per month for the son's health insurance. Peggy asked that the healthcare expenses be shared by Ronald.

¶ 17        Peggy testified her 2008 Ford Escape was worth $3200. In her suggested distribution of assets spreadsheet, Peggy did not include anything related to the outstanding temporary order of maintenance or the amount of the $16,188.31 insurance check Ronald was to deposit into a trust account. The check was issued to both Peggy and Ronald for fire damage to a rental house jointly owned by Peggy and Ronald. The check had a signature of "Peggy Mechling," but Peggy did not endorse the check. Peggy did not authorize Ronald to sign the check.

¶ 18        The parties had the properties appraised by court order. Peggy submitted a proposal based on the appraisals. According to Peggy's proposal, she would be awarded the marital residence, her retirement funds, her vehicle, and monies from checking, savings, and money market accounts, with the value of $294,157.01. The liabilities, which included nearly $31,000 owed on the home, totaled $46,528.27. The total value was $247,628.74 of the proposed award to Peggy. The proposal did not include the $12,000 figure Peggy requested for their son's college expenses.

¶ 19        Peggy's proposal included Ronald's being awarded the remaining real properties. Among the liabilities Peggy proposed Ronald be accorded was $8507.87 for a "Line of Credit," which Ronald acquired. Peggy valued Ronald's assets at $375,561.31 and his liabilities at $98,339.77. Peggy believed Ronald would have $277,221.54 in assets as a result of her proposed distribution.

¶ 20        When Peggy was first questioned about the purpose of the line of credit, Peggy testified, "Remodeling expenses, I believe. But I'm not sure if it was rentals or personal." Counsel asked, "[I]f it was remodeling expenses, was this done prior to [the court ordered] appraisal?" Peggy responded it was. Then, Peggy's counsel asked, "And did you say this was [a] business line of credit?" To which Peggy responded, "Yes." Ronald handled the line of credit. She did not know what he did with the money. Peggy never used the line of credit.

¶ 21        Peggy asked that Ronald pay the real estate taxes on the marital residence for 2018, payable in 2019. Ronald had been living exclusively in the marital residence since Peggy left in October 2016. Peggy testified she would pay the 2019 real estate taxes on the residence. Peggy sought half of the cash value of Ronald's life insurance policy. Peggy also requested half of the $33 in monthly restitution payments Ronald received from Paul House, who defrauded the

parties of over $50,000. Peggy was willing to waive future maintenance.

¶ 22    On cross-examination, Peggy testified Ronald had paid about one-third of their son's college expenses. Over half of the $16,000 in insurance proceeds, $8700, was used to pay for the appraisals of the properties. Since the separation, Ronald made all mortgage payments on the marital residence. He also made $4800 in temporary maintenance payments. Peggy was current on her expenses. She had a savings account with $5900. Peggy's debts had not increased. She had approximately $112.78 left over each month.

¶ 23    On redirect, Peggy testified her vehicle was 11 years old. She had no payment on it and had been unable to replace it. Since the separation, Peggy resided with her mother. Peggy paid her mother $200 per month in rent. The mortgage payment for the marital residence was $730. Before the separation, they were able to take vacations. In 2008, they went to Riviera Maya. In 2015, they went on a four- or five-day cruise to Cozumel. In 2016, Ronald purchased a new Mustang for $52,000. He made monthly payments of $687.22 toward the Mustang. The Mustang "got totaled on a vacation he was on with the boys." On that vacation, they traveled to 11 different baseball parks, including Chicago, Detroit, and Boston. Ronald invited her on the trip even though they were separated. Peggy did not go. She did not know what happened to the insurance proceeds. Ronald would take "the boys" on weekend trips to sporting events. Since the separation, Peggy had only taken one son to one ballgame in St. Louis. Peggy worked as a janitor for a church, earning a little over $10 per hour, 15 hours each week.

¶ 24    Ronald called Robert Grove to testify. Grove was Ronald's brother-in law. Grove testified he was "extremely" familiar with Ronald's business as he, for three years, assisted Ronald with the financial part of that business. Grove had extensive experience in finance, including having a master's degree in business administration and working over 33 years in the

Treasury Finance Department at Caterpillar. Grove helped Ronald prepare his April 30, 2019, financial affidavit. According to the affidavit, Ronald earned $11,182 per month in rental income and $572 in monthly referee income. Ronald listed his monthly deductions as $2400 in temporary maintenance and $9644 in business expenses. After adding the depreciation back in, Ronald had an annual income of about $24,000. Grove calculated Ronald's monthly living expenses to be $2137. This figure included the $780 payment on the refinanced mortgage and the $208 payment on the line of credit.

¶ 25          Grove testified the cash value of Ronald's whole-life-insurance policy was $5124 and his retirement was valued at $34,237. Ronald borrowed $7600 to pay for his son's college expenses.

¶ 26          Grove prepared a spreadsheet of information regarding the 22 rental properties Ronald owned and the 3 lots. The appraisals valued the properties, excluding the marital residence, at $294,400. The marital residence appraised at $210,200. The mortgage balance on the properties, as of December 31, 2018, and excluding the marital residence, was $206,894. On the marital residence, the mortgage balance on the refinanced mortgage was $33,856. The balance due on the line of credit secured by the marital residence was $9195. During the current year, the mortgage balance would have been reduced in total by approximately $11,000, paid by Ronald. The net equity value in the properties, not including the marital residence was $89,097. The net equity value in the family residence was $156,949.

¶ 27          Grove testified the total value of vehicles owned by Ronald was $9450. This included two vehicles his sons used, valued at $1700. Grove testified if Peggy received the marital residence, her net equity minus liabilities would be $236,000, while Ronald's would be $134,568.

¶ 28 According to Grove, Ronald's expenses "add up to $3906 a month," including the unpaid temporary maintenance. Ronald had only $2000 per month in spendable income. In addition to not paying maintenance, Ronald also was not paying the $705 per month he owed for their son's college expenses. To cover the difference between his income and expenses, Ronald used "essentially, all of his available savings of $26,000" and increased his debt by $11,000. Grove acknowledged the financial affidavit shows Ronald had approximately $20,000 in an account. Grove testified, however, within the bank accounts is cash held for security deposits on the rental property. At the time Grove was preparing the materials, Ronald was accruing cash to pay the first installment of the property taxes but Ronald, due to a shortfall in cash, had not been able to make the payment.

¶ 29 Grove testified the line of credit on the marital residence was used to renovate the family residence. Ronald had not claimed the line-of-credit funds as a business expense on his tax return.

¶ 30 On September 25, 2019, the trial court entered its order. Peggy was directed to provide their son's medical insurance. Both parties and their son were to each pay one third of education expenses. The student loan debts were to be shared equally by the parties as marital debt. The court denied the claims for past expenses.

¶ 31 Regarding the real estate, the court awarded Peggy the marital residence. Defendant was directed to discharge the line of credit. Defendant was awarded the balance of the real estate. Both parties were to keep the retirement account they accrued. Each party was able to keep the vehicles in their possession and to pay indebtedness on those vehicles. The court found both parties barred from maintenance. Each party was to pay their own attorney fees, except defendant was ordered to pay $350 in attorney fees for the contempt proceeding. The court also

stated the following, acknowledging the property had not been divided equally:

> "This is not an equal division but an equal division is not required. Plaintiff's greater share which include the vacation days is offset by the Defendant's failure to comply with the temporary maintenance Order and converting the balance of the $16,000 insurance check after paying the appraiser.
>
> ***
>
> Decision in the case has been made more difficult than it should have been by inconsistencies in Defendant's evidence. According to what he presented he made $2,000 per month out of which he paid his debt on his property and paid $3,500 in monthly expenses."

¶ 32 This appeal followed.

¶ 33 II. ANALYSIS

¶ 34 A. Temporary Maintenance

¶ 35 Ronald first argues the trial court abused its discretion in awarding temporary maintenance to Peggy. In making this argument, Ronald relies heavily on section 504 of the Dissolution Act (750 ILCS 5/504 (West 2016)), the section related to the calculation of maintenance, emphasizing the court did not comply with section 504(b-2)'s requirement of written factual findings or explain the deviation from applicable guidelines. Ronald further emphasizes the court erroneously failed to consider Ronald's business expenses in calculating support, resulting in an award of maintenance when Peggy earned more money than he did.

¶ 36 Peggy stresses section 501 (750 ILCS 5/501 (West 2016)) governs, not section

504. Peggy argues section 501, which provides for temporary relief, does not reference section 504.

¶ 37        Section 501 of the Dissolution Act authorizes the award of temporary maintenance based on "documentary evidence including, but not limited to, income tax returns, pay stubs, and banking statements." 750 ILCS 5/501(a)(1) (West 2016). Section 501(a) further states: "Issues concerning temporary maintenance or temporary support of a child entitled to support shall be dealt with on a summary basis based on allocated parenting time, financial affidavits, tax returns, pay stubs, banking statements, and other relevant documentation, except an evidentiary hearing may be held upon a showing of good cause." *Id.* § 501(a). In comparison, section 504 of the Dissolution Act lists factors a trial court is to consider when setting maintenance; it also mandates a trial court make factual findings when deciding maintenance. See *id.* §§ 504(a), (b-2).

¶ 38        In setting temporary maintenance, trial courts have "wide latitude." *In re Marriage of Greenberg*, 102 Ill. App. 3d 938, 941, 429 N.E.2d 1334, 1337 (1981). Because a temporary maintenance award is a matter within the trial court's discretion, we will not reverse such an order absent an abuse of that discretion. *Id.* The abuse-of-discretion standard is the most deferential standard of review. *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 159066, ¶ 69, 78 N.E.3d 941. An abuse of discretion will be found only when we find the decision unreasonable or arbitrary or we find no reasonable person would adopt the view taken by the trial court. *Id.*

¶ 39        The applicability of section 504 to a temporary maintenance decision under section 501 is not a simple question to resolve, particularly due to the parties' failure to develop the argument. Since January 2016, sections 501 and 504 have been modified multiple times.

While no version of section 501 references section 504, multiple versions of section 504 reference either "temporary" maintenance or section 501 specifically. See 750 ILCS 5/504(a) (West Supp. 2015) ("In a proceeding for dissolution of marriage ***, the court may grant a *temporary* or permanent maintenance award ***.") (Emphasis added.); 750 ILCS 5/504(a) (West Supp. 2019) ("In *** any proceeding authorized under Section 501 of this Act, the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just ***."). The version of section 504 in effect at the time of the final hearing specifically requires a court consider section 504 factors in setting temporary maintenance. *Id.* However, the versions in effect at the time the petition for temporary relief was filed and heard do not refer to temporary maintenance or section 501. In fact, the 2016 version of section 504 removed the term "temporary" that appeared in the earlier version: "In a proceeding for dissolution of marriage ***, the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse." 750 ILCS 5/504(a) (West 2016); 750 ILCS 5/504(a) (West Supp. 2017); 750 ILCS 5/504(a) (West 2018). Although Peggy now asserts section 504 does not apply, her request for temporary maintenance sought the award under section 504.

¶ 40        We need not decide which version applies and whether the trial court complied with section 504 or needed to, as Ronald's failure to develop the argument results in a forfeiture of his challenge regarding the trial court's alleged failure to comply with the specific findings requirements of section 504. Ronald cites no authority or case law showing the trial court's failure to make specific findings of fact (750 ILCS 5/504(b-2)(1) (West Supp. 2019)) or explain the reasons for deviating from guidelines (*id.* § 504(b-2)(2)) in setting temporary maintenance is

- 12 -

a basis for reversal or remand. Instead, Ronald dumped the burden of research and argument on this court, rendering this argument forfeited. See *People v. Hood*, 210 Ill. App. 3d 743, 746, 569 N.E.2d 228, 230 (1991); Ill. S. Ct. Rule 341(h)(7) (eff. May 25, 2018) (mandating argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities"). In addition, Ronald forfeited the argument by not raising it before the trial court. At no point during the hearings on Peggy's request for temporary maintenance or on Ronald's motion to reconsider or in his pretrial argument or closing argument for the final hearing did Ronald argue section 504's requirement for specific findings applied and the court erred by not providing specific findings. Issues not raised in the trial court are forfeited from appellate review. See *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 85, 968 N.E.2d 115.

¶ 41        We turn to Ronald's argument the award was otherwise an abuse of discretion. Ronald emphasizes, at the hearing on the motion to reconsider, Peggy's counsel asserted Ronald was in control of over $1,000,000 in real estate with no debt while the evidence at the final hearing demonstrates the value of the real estate, minus the mortgages, was only $89,000. Ronald emphasizes, at that same hearing, Peggy stated Ronald's gross income was $150,000, but this figure, he argues, fails to account for the business expenses allowed by section 505 (750 ILCS 5/505 (West 2016)). In support of his contention Peggy did not need temporary maintenance, Ronald further points to the fact Peggy did not seek additional maintenance and she was able to meet her monthly expenses.

¶ 42        Ronald's argument essentially asks this court to look at temporary maintenance based solely upon the evidence provided at the 2019 hearing. Ronald starts with Grove's testimony and the evidence showing the real property, excluding the marital home, had a value, minus the mortgages, of only $89,000 and, after expenses, Ronald's income was $2000 per

month. Ronald further emphasizes Grove's testimony Ronald used savings and avoided paying his maintenance debts to Peggy and repaying a loan to his father to survive to bridge the gap between his income and expenses.

¶ 43        Ronald's argument, however, ignores the progression of the case, including the evidence and arguments put to the court beginning in late 2016. If we begin the analysis of the trial court's decision by looking at that evidence and argument, we see a very different picture than the one painted by Robert. As of the January 2017 hearing on temporary maintenance, Ronald's income from the real property, minus depreciation, was approximately the same as Peggy's. However, the numbers on his own financial affidavit show the parties had over $410,000 in equity in the real property, excluding the marital home. On his affidavit, Ronald listed the real property, including the marital residence, with a fair market value of nearly $900,000. While Ronald identified the mortgages for the individual properties on a table, he did not add those mortgages together nor subtract them from the fair market value to provide an equity value for the court. At the hearing on temporary maintenance, no argument was made regarding the value of the properties or Ronald's ability to pay. Instead, Ronald challenged Peggy's need for maintenance. Ronald argued Peggy's expenses included education expenses for their college-aged son and such expenses should have been sought not in temporary maintenance proceedings but under section 513 of the Dissolution Act (750 ILCS 5/513 (West 2016)). Ronald further argued Peggy's calculation improperly included a medical-related expense. The court found Ronald's arguments unconvincing and awarded Peggy $2400 in temporary maintenance upon finding "this is what it costs her to live."

¶ 44        After the trial court granted $2400 in temporary maintenance, Ronald asked the court to reconsider its ruling not based on the contention Peggy did not need maintenance but

- 14 -

that Ronald's income was insufficient to justify it. Ronald did not pursue the argument regarding college expenses. Ronald sought instead to prove his income was similar or less than Peggy's and thus maintenance was unnecessary. He did this by pointing to his business expenses that he reported on his 2015 tax return, which had been provided to the court. From that tax return, Ronald's counsel calculated Ronald's gross earnings to be $33,500. When Peggy's counsel asserted Ronald had control over $1,000,000 in property, Ronald did not dispute the contention. The trial court was left with the same figures provided before the initial hearing, showing the value of Ronald's business to be over $410,000. The court permitted the $2400 maintenance award to stand.

¶ 45    Ronald's third challenge to Peggy's request for maintenance occurred at the final hearing regarding property division, which began in June 2019. Ronald's income was approximately $24,000 per year. After the agreed-upon, court ordered appraisals, the value of the properties, excluding the marital residence, changed from over $410,000 to approximately $89,000. By this time, in violation of court order, Ronald had not made over $70,000 in maintenance payments. He failed to comply with the order requiring he deposit the insurance check from fire damage into the specified trust account, and there was evidence Ronald forged Peggy's signature. Ronald also did not testify at the hearing.

¶ 46    Given these circumstances, it is not so unreasonable or arbitrary the trial court refused Ronald's request to change the order for temporary maintenance. The record provides no indication it failed to account for Ronald's business expenses. Instead, the record indicates the court did not believe Ronald. We are not convinced the court abused its discretion in ordering temporary maintenance.

¶ 47                B. Line of Credit on the Marital Residence

- 15 -

¶ 48       Ronald argues the trial court erred in ordering him to pay the line of credit indebtedness on the marital home that was awarded to Peggy. Ronald contends the evidence is contradictory on the reason for the purpose of the line of credit. While Peggy initially testified the line of credit was for "remodeling expenses" and she did not know whether it was for the marital home or for Ronald's business, Peggy asserted, after a leading question by her counsel, the line of credit was for Ronald's business. Ronald also was the only one who used the line of credit, but Grove's testimony shows Ronald, who kept records of his business expenses, did not claim on tax records the line of credit repayments. He further contends, because Peggy was awarded the home, it "follows logically" she would pay the indebtedness, particularly given she was awarded the bulk of the estate.

¶ 49       A trial court is to divide property marital property in "just proportions." 750 ILCS 5/503(d) (West 2016). Illinois trial courts have considerable discretion in resolving matrimonial financial matters as an "equitable division depends on more than merely an analysis of dollars and cents." *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 22, 14 N.E.3d 524. An equitable division depends upon, as well, the court's observations of the parties during their testimony and the economic circumstances of the parties. *Id.* Marital debts, like marital assets, must be distributed equitably. *In re Marriage of Davis*, 292 Ill. App. 3d 802, 807, 686 N.E.2d 395, 399 (1997). An equitable division of marital debts does not require an equal division. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 212-13, 902 N.E.2d 777, 786 (2009). We will reverse a decision regarding the division of marital property, including a division of debts, only if the trial court abused its discretion in making its ruling. See *Abu-Hashim*, 2014 IL App (1st) 122997, ¶¶ 22, 24.

¶ 50       Ronald has not established the trial court's decision attributing the debt to him

was an abuse of discretion. We agree the evidence does not establish the line of credit was used for the rental properties. That decision, however, does not render the apportionment "unreasonable." Nor does the allegation it would be "logical" to attribute the debt with the marital residence. The court had considerable discretion to divide the property and debts and it distributed this debt to Ronald as a part of the overall distribution of property and debts. We are not convinced this assignment, standing alone as Ronald presents it on appeal, is an abuse of discretion.

¶ 51                     C. Distribution of the Marital Estate

¶ 52          Ronald last argues the trial court erred by not ordering Peggy to pay anything to Ronald for his portion of the marital home. In support of this argument, Ronald summarized only a portion of the debts and assets attributed to the parties. To Peggy, he listed in his brief the value of the marital home ($200,000), Peggy's vacation days ($7652.64), and the first mortgage debt ($33,856), and argued the net equity was $158,491.36. For himself, he listed his real estate value as $295,991, the mortgage against that real estate as $206,894, the line of credit debt at $9195, and the insurance payout received as $16,188.31. Ronald concludes the net equity of the distribution to him was $96,090.31. Ronald assumes, for the sake of his argument, the other property was divided equally. Ronald contends the fact Peggy received $62,401 more than he did, "with no just reason or balancing as to why," fails to satisfy the reasonable-person standard.

¶ 53          Contrary to the language in Ronald's opening brief, the standard is not what a reasonable person would decide. As we stated above, we review the decision of the trial court under the abuse-of-discretion standard. Under that standard, reversal is appropriate if we find, in part, no reasonable person would adopt the position of the trial court. *Pekin Insurance*, 2016 IL App (4th) 159066, ¶ 69. Here, the trial court provided a reason for the unequal distribution of

real property: "Plaintiff's greater share which include the vacation days is offset by the Defendant's failure to comply with the temporary maintenance Order and converting the balance of the $16,000 insurance check after paying the appraiser." The difference in the distribution, as Ronald presents here, is $62,401, which is lower than the amount the trial court deemed Ronald owed Peggy in temporary maintenance. As we have found Ronald did not establish the trial court's award of temporary maintenance was an abuse of discretion, it was not an abuse of discretion to apportion the equity in Peggy's favor to compensate for the lost maintenance.

¶ 54                                    III. CONCLUSION

¶ 55            We affirm the trial court's judgment.

¶ 56            Affirmed.